UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
: 
In re: : Chapter 11
:
PACHANGA, INC., *et al.*,[1] : Case No.: 18-[    ]
: (Joint Administration Pending)
Debtors. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**AFFIDAVIT OF LARS AKERLUND PURSUANT TO LOCAL BANKRUPTCY
RULE 1007-2 AND IN SUPPORT OF FIRST DAY MOTIONS AND APPLICATIONS**

STATE OF NEW YORK    )
                     ) ss
COUNTY OF NEW YORK   )

Lars Akerlund, being duly sworn, deposes and says:

1.   I am the President and founder of Pachanga, Inc. (together with its affiliated debtors and debtors in possession, the "Debtors"), and I am familiar with the business and affairs of the Debtors. I submit this declaration in accordance with Local Bankruptcy Rule 1007-2 in support of the Debtors' voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and the relief, in the form of motions and applications, that the Debtors have requested of the Court (the "First Day Motions"). I believe the relief sought in each of the First Day Motions is (i) necessary to enable the Debtors to operate in chapter 11 with minimum disruption to their operations or loss of revenue, (ii) critical to the Debtors' achieving a successful restructuring in chapter 11, and (iii) in the best interests of the Debtors' estates, creditors and all parties in interest.

---

[1] The Debtors in these chapter 11 cases are: Pachanga, Inc.; Corossol FIKA Tower LLC; Corossol LLC; Corossol Tribeca LLC; FIKA 41 W 58th Street LLC; FIKA 66 Pearl Street LLC; FIKA 141 W 41st Street LLC; FIKA 157 7th Avenue; FIKA 824 10th Ave LLC; FIKA Catering LLC; FIKA Espresso Bars LLC; FIKA Tribeca LLC; FIKA Web Orders LLC; and MILA Solutions LLC. The Debtors corporate headquarters and mailing address is 824 10th Avenue, New York, NY 100019.

1

2. Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, upon information supplied to me by the Debtors' employees, and from my review of relevant documents, or otherwise upon my opinion based upon my experience, my discussions with the Debtors' advisors and my knowledge of the Debtors' business and financial condition.

## INTRODUCTION

3. The Debtors intend to proceed as expeditiously as permitted through their chapter 11 cases for the purposes of effecting a sale of substantially all of their assets to a stalking horse purchaser, FIKA Acquisitions LLC ("FIKA Acquisitions"), subject to higher and better offers in an auction process approved by the Court.

4. FIKA Acquisitions is the Debtors' pre-petition secured creditor by virtue of an assignment of over $11 million in secured claims held by Apfel Holdings LLC ("Apfel"). Pursuant to an Asset Purchase Agreement (the "Stalking Horse APA") to be entered into between FIKA Acquisitions and the Debtors, FIKA Acquisitions will purchase substantially all of the assets of the Debtors. The purchase price under the Stalking Horse APA will consist of a credit bid of FIKA Acquisition's secured debt as well as a cash component. The Stalking Horse APA will be subject to higher and better offers.

5. In order to effectuate the sale and to conduct the marketing, bidding and auction process, the Debtors engaged SSG Capital Advisors LLC ("SSG"), a leading investment banking firm that specializes in middle-market distressed transactions, prior to the petition date to act as investment banker. Furthermore, because certain members of FIKA Acquisitions are insiders of the Debtors, the Debtors appointed an independent director to determine (i) whether a sale of substantially all of the assets of the Debtors is in the best interest of the Debtors, (ii) whether any bidding procedures governing the sale is reasonable and tailored to generate the highest and best

offers at an auction, and (iii) in the event an auction is held in connection with the sale, the highest and best offer submitted.

6. Although the Debtors' business has been marketed to potential third-party investors for over a year, the Debtors have engaged SSG to ensure that all efforts have been made to market the assets and to attract the highest and best offer. Given the length of time that these assets have been on the market, the Debtors intend to seek approval for a short post-petition marketing period so as to reduce the length of time prior to consummating the sale. The Debtors' goal is to complete the sale process within 60 days of the Petition Date. Critically, the Debtors have sufficient funds and anticipated revenues to operate only through the first ten weeks of these chapter 11 cases, as reflected in the 13-week budget (the "Budget") prepared by the Debtors annexed hereto as Exhibit B.

7. The Debtors' sale is the best result for key stakeholders under difficult circumstances. For vendors and other creditors, the sale means the continuing existence of a steady customer, one that will be better capitalized and more able to fulfill its obligations. For the Debtors' employees, the sale means that their jobs will be preserved.

## BUSINESS OF THE DEBTORS

8. The Debtors, doing business under the trade name FIKA, are owner/operators of specialty espresso bars and restaurants in New York City, as well as an award-winning chocolate operation. I founded the business in 2006 to bring the Swedish concept of "fika" (which means "to drink coffee") to New York. Fika represents the coffee culture in Sweden, where it is a common tradition to take several fikas a day, and to take time each day for a break.

9. FIKA opened its first store in 2006 at its 58th Street location between 5th and 6th Avenues. From 2006 to 2013, FIKA expanded its operations to five locations. FIKA's organic and steady growth over the years was a testament to the strength of the underlying business

3

model, the value of the FIKA brand, and the potential for growth. As a result, FIKA's operations underwent rapid expansion beginning in 2013 when it brought in Apfel as an outside investor and opened twelve more stores (for a total of 17 stores) in 2014 and 2015. Unfortunately, FIKA was unable to secure additional funding at a critical juncture of the company's expansion and was forced to close a number of its locations in 2016 and 2017.

10. The Debtors have four main sources of revenue: retail sales at the espresso bars; wholesale operations; catering; and e-commerce.

11. FIKA currently operates espresso bars at six locations:

- FIKA 58th Street (41 W. 58th Street)
- FIKA 7th Avenue (155 7th Avenue)
- FIKA Bryant Park (114 W. 41st Street)
- FIKA Pearl Street (66 Pearl Street)
- FIKA Tower & Bakery (824 10th Avenue) (corporate headquarters)
- FIKA Tribeca (450 Washington Street)

12. The espresso bars serve coffee and small food items, such as sandwiches, wraps and pastries made on premises at FIKA's bakery and kitchen at the 10th Avenue location. FIKA also operates a "pop-up" store in the Saks Fifth Avenue department store located at 611 Fifth Avenue.

13. The Debtors' wholesale operations are responsible for producing and/or selling chocolates, jams, spreads, and FIKA coffee beans. FIKA's award-winning and world class chocolates are made at the 450 Washington Street chocolate factory. The Debtors supply their wholesale products to high end food retailers such as Dean & Deluca and Whole Foods Market.

14. The Debtors also generate revenues from there catering business and from online sales at their website www.fikanyc.com.

4

## EVENTS LEADING TO CHAPTER 11

15. On September 14, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. (the date of filing of the voluntary petitions for relief, the "Petition Date"). Although the Debtors contemplated the commencement of chapter 11 cases in order to effectuate a sale of its assets to FIKA Acquisitions (as required under the terms of the transaction with the investor party that committed funding to capitalize FIKA Acquisitions), the Petition Date occurred earlier than expected for the reasons set forth below.

**A.    The Initial Investor Expansion**

16. As discussed above, FIKA enjoyed steady growth for the seven-period following the opening of its first store. Bolstered by the proven success of its business model and encouraged by the enormous potential in the FIKA brand, FIKA looked to leverage its past success and extend the growth model.

17. Starting in 2013, Apfel agreed to loan money to fund the expansion of the business. Through 2017, Apfel has funded over $10 million in loans to FIKA. FIKA's aggressive expansion (it opened seven new stores in 2014 and five additional stores in 2015) required significant start-up expenses for each of the locations before they could become profitable. In the midst of the expansion, however, FIKA was unable secure additional funding to pay the expenses of FIKA's expansion costs.

18. As a result, FIKA's operations could not absorb the increased start-up costs from the new retail locations, and FIKA was forced to return to its more streamlined, conservative business model centered on its profitable stores. Consequently, in 2016 and 2017, FIKA closed down a number of its stores, reducing its operations to the current six retail locations, as well as the Saks Fifth Avenue pop-up store and the 450 Washington chocolate factory.

5

**B.     The FIKA Acquisitions Transaction**

19.    Saddled with the significant legacy costs from the failed expansion, FIKA undertook to find alternate sources for funding. Beginning in August 2017, FIKA engaged a financial advisor to obtain investment capital.

20.    The advisor marketed the investment opportunity extensively, made a number of presentations to potential investors, and fielded due diligence inquiries from several interested parties. No party, however, agreed to provide capital.

21.    Beginning in the first quarter of 2018, the advisor engaged in discussions with an affiliate of a large distributor with a national presence, regarding a potential investment opportunity in FIKA. In or about July 2018, the affiliate agreed in principle with FIKA's management and owners to provide financing, and the parties negotiated agreements in connection with an acquisition of FIKA's assets through an acquisition vehicle that would purchase the assets through a section 363 sale in bankruptcy. Thus, the Debtors' commencement of these chapter 11 cases has been contemplated since August 2018, when negotiations among the parties was finalized.

22.    Although these bankruptcy cases were anticipated to be filed, the timing of the filings was hastened by the closure of the retail stores by the New York State Department of Taxation and Finance, which caused severe disruptions to the Debtors' operations. The commencement of these chapter 11 cases followed promptly thereafter.

**CORPORATE STRUCTURE**

23.    Annexed hereto as <u>Exhibit A</u> is the Debtors' organizational chart. As set forth therein, I am the 51.1% shareholder of Pachanga, Inc., which is the corporate parent of all of the FIKA entities. I am also the Sole Director of the Board of Directors for Pachanga, Inc. Apfel

holds the remaining 49.9% of the share of Pachanga, Inc. by virtue of Apfel's voluntary conversion of a convertible promissory note to equity pursuant to a stock redemption agreement.

24. Pachanga, Inc. is the sole member of MILA Solutions, LLC (the entity that manages FIKA's employees), the sole member of FIKA Espresso Bars LLC (the parent company for each of the retail store operating entities), the 92% member of Corossol LLC[2] (the parent company for the entities that operate FIKA's chocolate factory), the sole member of FIKA Web Orders LLC (the entity that operates FIKA's ecommerce business), and the sole member of FIKA Catering LLC (the entity that operates FIKA's catering business).

## CAPITAL STRUCTURE AND PREPETITION INDEBTEDNESS

25. The Debtors' principal pre-petition secured lender is Apfel, whose secured debt against the Debtors is in the amount of $11,114,604 as of July 31, 2018. Pursuant to an Assignment and Assumption Agreement between Apfel and FIKA Acquisitions, Apfel assigned of its secured claims against the Debtors. FIKA Acquisitions has also made loans directly to the Debtors prior to the Petition Date in order to fund certain of the operating expenses of the Debtors, as well as pre-petition funding of the costs of administering these chapter 11 cases.

26. Pachanga, Inc., the parent Debtor, is a borrower under that certain Loan Authorization and Agreement dated November 30, 2012 with the U.S. Small Business Administration (the "SBA") for a loan in the principal amount of $555,800.00 (the "SBA Loan"). The SBA Loan is current, and the Debtors will pay the SBA regular monthly principal and interest on a post-petition basis as adequate protection.

## SUMMARY OF FIRST-DAY MOTIONS AND APPLICATIONS

27. To minimize the adverse effects of the commencement of the chapter 11 cases on the Debtors' business and employees, the Debtors have requested various types of relief in their

---

[2] FIKA's Master Chocolatier, Hakan Martensson holds an 8% membership interest in Corossol LLC.

7

First Day Motions, all of which are either being filed concurrently with this Affidavit, or will be filed shortly after the Petition Date. I believe that the relief requested in each of the First Day Motions is necessary, appropriate, and is in the best interests of the Debtors' estates, creditors, and other parties in interest.

28. I have reviewed each of the First Day Motions (described below), including any exhibits and schedules thereto, and, to the best of my knowledge, I believe that the facts set forth in the First Day Motions are true and correct. If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motion.

29. Furthermore, as a result of my personal knowledge, information supplied to me by other members of the Debtors' management and employees, from my review of relevant documents, or upon my opinion based upon my experience, discussions with the Debtors' advisors and knowledge of the Debtors' operations and financial condition, I believe the relief sought in the First Day Motions is necessary for the Debtors to effectuate a smooth transition into chapter 11 bankruptcy, to avoid irreparable harm to their business and estates, and is in the best interests of the Debtors' creditors, estates, and other stakeholders.

30. Accordingly, for the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of the Chapter 11 Cases, I believe the relief sought in the First Day Motions should be granted by the Court, together with such other and further relief for the Debtors as the Court deems just and proper, in the most expeditious manner possible.

**A.    Joint Administration Motion**

31. The Debtors seek an order from the Court to jointly administer the Chapter 11 Case. The Debtors in these proceedings are affiliated and related, but independent, entities.

Thus, joint administration of the Chapter 11 Cases is appropriate under Bankruptcy Rule 1015(b).

32. The joint administration of the Chapter 11 Cases will permit the Clerk of the Court to use a single general docket for each of the Debtors' cases and to combine notices to creditors and other parties-in-interest of the Debtors' respective estates. Indeed, the Debtors anticipate that numerous notices, applications, motions, other pleadings, hearings, and orders in the Chapter 11 Cases will affect all of the Debtors.

B.  **Cash Collateral Motion**

33. The Debtors seek an order from the Court authorizing them to use cash collateral and to provide adequate protection.

34. The Debtors propose to use cash collateral to pay ordinary and necessary operating expenses to the extent set forth in the Budget. The Debtors' proposed operational expenditures relate to, *inter alia*, the post-petition purchase of inventory and supplies, and to pay for outside services and payroll and payroll-related expenses. At the current time, no material capital expenditures are contemplated.

35. The use of cash collateral is necessary, appropriate and, indeed, essential to the Debtors' reorganization efforts. Absent the ability to use cash collateral, the Debtors will be unable to support their operations and reorganize their businesses.

C.  **Employee Wage Motion**

36. As is typical in chapter 11 cases, the Debtors request authorization to: (i) pay and/or perform, as applicable, pre-petition obligations to their employees, including accrued pre-petition wages, salaries, and certain employee benefits; (ii) pay all related pre-petition withholdings and payroll-related taxes; (iii) reimburse employees for pre-petition expenses that they have incurred on behalf of the Debtors in the ordinary course of business; (iv) continue their

9

employee benefit programs, and pay all fees and costs in connection therewith, including pre-petition amounts; and (v) continue, in the Debtors' discretion, any other employee benefit program that the Debtors deem necessary.

37. The Debtors' employees perform a variety of critical functions for the Debtors, including sales, administrative, supervisory and other tasks, as well as serving in managerial roles. The employees' skills, and their knowledge and understanding of the Debtors' business, infrastructure and operations are essential to the effective and uninterrupted operation of the Debtors' business during the chapter 11 cases.

38. The Debtors also request that the Court direct all applicable banks to receive, process, honor and pay all pre-petition checks or other transfers drawn on any of the Debtors' accounts to pay employee obligations.

### D. Cash Management Motion

39. The Debtors seek authority to (a) continue using their current cash management system, (b) continue using and maintaining existing bank accounts (as well as authorizing the Debtors to open and close bank accounts), and (c) continue using existing business forms.

40. The U.S. Trustee has established certain operating guidelines for a debtor in possession in order to supervise the administration of chapter 11 cases. These guidelines require a chapter 11 debtor to, among other things, close all existing bank accounts and open new debtor-in-possession bank accounts, establish debtor-in-possession accounts for all estate monies required for the payment of taxes, including payroll taxes, maintain a separate debtor-in-possession account for cash collateral, and obtain checks for all debtor-in-possession accounts which bear the designation "debtor in possession," the bankruptcy case number, and the type of account.

41. As of the Petition Date, the Debtors maintained certain checking accounts with Capital One Bank. The Debtors seek a waiver of the requirement that new accounts be opened in replacement of the Debtors' existing accounts. If enforced in these chapter 11 cases, such a requirement would unnecessarily disrupt the administration of the payroll and the operations of the Debtors and would have considerable adverse economic and operational consequences on the Debtors' relations with vendors and the timely meeting of the Debtors' obligations to those suppliers, as well as other creditors.

## **INFORMATION REQUIRED BY LOCAL BANKRUPTCY RULE 1007-2**

42. To the best of my knowledge, and upon information and belief, I provide the following information related to the Debtors, as required by Local Bankruptcy Rule 1007-2(a) and (b):

   i. The nature of the Debtors' business and the circumstances leading to the Chapter 11 Cases is discussed above.

   ii. The Chapter 11 Cases were not originally commenced under chapter 7 or chapter 13.

   iii. No committee was organized prior to the Petition Date.

   iv. Information regarding each of the Debtors' twenty largest unsecured creditors has been filed contemporaneously herewith.

   v. Information regarding the Debtors' secured creditors has been filed contemporaneously herewith.

   vi. A summary of each of the Debtors' assets and liabilities has been filed contemporaneously herewith.

   vii. The Debtors do not have any publicly held securities.

   viii. The following property of the Debtors is in the possession of a custodian: funds levied against certain of the Debtors' bank accounts in the amount of approximately $192,000.00 are in the possession of New York City Marshal Stephen W. Biegel, 109 W. 38th Street, New York, NY 10018.

ix. The Debtors do not own the premises from which the operate, and information regarding the premises leased by the Debtors from which the Debtors operate their business is set forth above.

x. The Debtors' substantial assets are located at the premises discussed above, and information regarding the Debtors' books and records has been filed contemporaneously herewith in the Debtors' Statements of Financial Affairs. The Debtors do not hold any assets outside the United States.

xi. Information regarding pending or threatened actions or proceedings against the Debtors has been filed contemporaneously herewith in the Debtors' Statements of Financial Affairs.

xii. I, along with my wife, Lena Khoury, Director of Sales and Marketing, comprise the Debtors' senior management.

xiii. The estimated amount of the weekly payroll to employees (exclusive of officers, directors, stockholders, and partners) for the thirty days following the Petition Date is $136,000.00.

xiv. The estimated amount to be paid to officers in the thirty days following the Petition Date is $18,500.00.

xv. The Debtors' projected cash receipts or disbursements, net cash gain or loss, or obligations and receivables in the 30-day period following the petition date is annexed hereto as Exhibit B.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Dated: September 13, 2018

_____
Lars Akerlund
President, Pachanga Inc.

Sworn to before me this
13 day of September, 2018

_____

**State of New York**
**County of New York**

**Latasha Baker**
Commissioner of Deeds,
State of New York
No. 1 10107
Qualified in New York County
& Kings Couny
Commission Expires 06-01-2020

13

# EXHIBIT A
# (ORG. CHART)



# EXHIBIT B
# (13 WEEK BUDGET/CASH FLOW)

| | Forecast Week 1 | Forecast Week 2 | Forecast Week 3 | Forecast Week 4 | Forecast Week 5 | Forecast Week 6 | Forecast Week 7 | Forecast Week 8 | Forecast Week 9 | Forecast Week 10 | Forecast Week 11 | Forecast Week 12 | Forecast Week 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Beginning** | 9/12/2018 | 9/19/2018 | 9/26/2018 | 10/3/2018 | 10/10/2018 | 10/17/2018 | 10/24/2018 | 10/31/2018 | 11/7/2018 | 11/14/2018 | 11/21/2018 | 11/28/2018 | 12/5/2018 | 9/12/2018 |
| **Week Ending** | 9/18/2108 | 9/25/2108 | 10/2/2108 | 10/9/2108 | 10/16/2108 | 10/23/2108 | 10/30/2108 | 11/6/2108 | 11/13/2108 | 11/20/2108 | 11/27/2108 | 12/4/2108 | 12/11/2108 | 12/11/2108 |
| **Cash Receipts** | | | | | | | | | | | | | | |
| Store | $80,000.00 | $80,000.00 | $85,000.00 | $80,000.00 | $80,000.00 | $85,000.00 | $85,000.00 | $85,000.00 | $82,500.00 | $82,500.00 | $82,500.00 | $82,500.00 | $82,500.00 | $1,072,500.00 |
| Wholesale | 2,627.99 | 2,734.87 | 2,485.42 | 4,860.40 | 4,816.93 | 5,012.82 | 4,555.60 | 5,369.67 | 5,321.64 | 5,538.06 | 5,032.93 | 6,154.72 | 6,099.67 | 60,610.71 |
| Web | 1,036.18 | 1,078.32 | 979.97 | 1,193.27 | 1,182.60 | 1,230.69 | 1,118.44 | 1,382.72 | 1,575.90 | 1,885.99 | 2,737.59 | 1,590.12 | 1,575.90 | 18,567.69 |
| Catering | 1,182.60 | 1,230.69 | 1,118.44 | 1,193.27 | 1,182.60 | 1,230.69 | 1,118.44 | 1,193.27 | 1,182.60 | 1,230.69 | 1,118.44 | 1,193.27 | 1,182.60 | 15,357.60 |
| **Total Sales ( Cash Receipts)** | **$84,846.77** | **$85,043.88** | **$89,583.83** | **$87,246.94** | **$87,182.12** | **$92,474.20** | **$91,792.48** | **$92,945.66** | **$90,580.13** | **$91,154.73** | **$91,388.96** | **$91,438.12** | **$91,358.17** | **$1,167,036.00** |
| **CASH PAID OUT** | | | | | | | | | | | | | | |
| **Rent, Leases & Payroll:** | | | | | | | | | | | | | | |
| Store Rent | | | 76,928.35 | | | | 76,928.35 | | | | | 76,928.35 | | 230,785.06 |
| Other Rent (Chocolate Factory & Corporate Office) | | | 25,727.62 | | | | 25,727.62 | | | | | 25,727.62 | | 77,182.85 |
| Payroll (Including taxes) | 33,000.00 | 59,000.00 | 33,000.00 | 39,000.00 | 34,000.00 | 35,000.00 | 61,000.00 | 35,000.00 | 41,000.00 | 35,000.00 | 61,000.00 | 35,000.00 | 41,000.00 | 542,000.00 |
| Lease Payments for Equipment | | | 4,000.89 | | | | 4,000.89 | | | | | 4,000.89 | | 12,002.67 |
| Sales Tax | 7,100.00 | 7,100.00 | 7,543.75 | 7,100.00 | 7,100.00 | 7,543.75 | 7,543.75 | 7,543.75 | 7,321.88 | 7,321.88 | 7,321.88 | 7,321.88 | 7,321.88 | 95,184.38 |
| **Total Rent, Leases & Payroll** | **$40,100.00** | **$66,100.00** | **$147,200.61** | **$46,100.00** | **$41,100.00** | **$42,543.75** | **$175,200.61** | **$42,543.75** | **$48,321.88** | **$42,321.88** | **$68,321.88** | **$148,978.73** | **$48,321.88** | **$957,154.95** |
| **Purchases from Vendors:** | | | | | | | | | | | | | | |
| US FOODS | $8,000.00 | $7,132.80 | $7,132.80 | $7,132.80 | $8,572.56 | $8,572.56 | $8,572.56 | $7,947.10 | $9,567.99 | $9,587.27 | $9,675.56 | $7,304.91 | $9,567.99 | $108,766.89 |
| IMPERIAL | 5,000.00 | 4,300.00 | 4,300.00 | 4,300.00 | 5,167.96 | 5,167.96 | 5,167.96 | 4,790.90 | 5,768.05 | 5,779.68 | 5,832.90 | 4,403.75 | 5,768.05 | $65,747.20 |
| BARTLETT | 3,500.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,605.55 | 3,605.55 | 3,605.55 | 3,342.49 | 4,024.22 | 4,032.33 | 4,069.47 | 3,072.39 | 4,024.22 | $45,881.77 |
| UNIQUE COFFEE | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 9,614.80 | 9,614.80 | 9,614.80 | 8,913.30 | 10,731.26 | 10,752.88 | 10,851.91 | 8,193.03 | 10,731.26 | $121,018.05 |
| CLW | 2,000.00 | | 2,000.00 | | 2,403.70 | 0.00 | 2,403.70 | 0.00 | 2,682.81 | 0.00 | 2,712.98 | 0.00 | 2,682.81 | $16,886.01 |
| MARVE | 2,000.00 | | 2,000.00 | | 2,403.70 | 0.00 | 2,403.70 | 0.00 | 2,682.81 | 0.00 | 2,712.98 | 0.00 | 2,682.81 | $16,886.01 |
| AGRI EXOTIC | 2,309.89 | | | | 2,776.14 | 0.00 | 0.00 | 0.00 | 3,098.50 | 0.00 | 0.00 | 0.00 | 3,098.50 | $11,283.04 |
| NOBLE INGREDIENTS | 2,500.00 | | | | 3,004.63 | | | | 3,353.52 | | | | 3,353.52 | $12,211.66 |
| AOI MATCHA | | | 750.00 | | 0.00 | 0.00 | 901.39 | 0.00 | 0.00 | 0.00 | 1,017.37 | 0.00 | 0.00 | $2,668.75 |
| PARIS GOURMET | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | $32,500.00 |
| REVERE GROUP | | | 1,022.03 | | 0.00 | 0.00 | 1,228.33 | 0.00 | 0.00 | 0.00 | 1,386.37 | 0.00 | 0.00 | $3,636.73 |
| FODERA FOODS | 3,021.88 | | | | 3,631.85 | 0.00 | 0.00 | 0.00 | 4,053.57 | 0.00 | 0.00 | 0.00 | 4,053.57 | $14,760.87 |
| AUI | | 1,600.00 | | | 0.00 | 1,922.96 | 0.00 | 0.00 | 0.00 | 2,150.58 | 0.00 | 0.00 | 0.00 | $5,673.54 |
| PSG LABELS | 9,800.00 | | | | | | | | | | | | | |
| FOLDED COLOR | 9,500.00 | | | | | | | | | | | | | |
| TOMRIC (CHOCOLATE MOLDS) | 4,500.00 | | | | | | | | | | | | | |
| URGENT STORE REPAIRS (Marino Tiles, Home Depot, Manhattan Laminates, Lumber Liquidators) | 10,000.00 | 16,000.00 | 10,000.00 | | | | | | | | | | | |
| **Total Purchases from Vendors** | **$72,631.77** | **$42,532.80** | **$40,704.83** | **$24,932.80** | **$43,680.89** | **$31,383.83** | **$36,397.99** | **$27,493.78** | **$48,462.74** | **$34,802.74** | **$40,759.53** | **$25,474.08** | **$48,462.74** | **$517,720.52** |
| **G&A and Other Expenses:** | | | | | | | | | | | | | | |
| SSG Monthly Fee | 25000 | | | | 25000 | | | | 25000 | | | | 25000 | $100,000.00 |
| Credit Card Processing Fees | $2,400.00 | $2,400.00 | $2,550.00 | $2,400.00 | $2,400.00 | $2,550.00 | $2,550.00 | $2,550.00 | $2,475.00 | $2,475.00 | $2,475.00 | $2,475.00 | $2,475.00 | $32,175.00 |
| Health Insurance | | | 6,700.00 | | | | 6,700.00 | | | 6,700.00 | | 6,700.00 | | 26,800.00 |
| Store Maintenance | 1,250.00 | 1,250.00 | 1,250.00 | 1,250.00 | 1,250.00 | 1,250.00 | 1,250.00 | 1,250.00 | 1,250.00 | 1,250.00 | 1,250.00 | 1,250.00 | 1,250.00 | 16,250.00 |
| Grease Removal (RUSSEL REID) | | | 1,565.00 | | 0.00 | 0.00 | 1,880.90 | 0.00 | 0.00 | 0.00 | 2,122.90 | 0.00 | 0.00 | 5,568.80 |
| Exterminator (RJS) | | | 2,500.00 | | 0.00 | 0.00 | 3,004.63 | 0.00 | 0.00 | 0.00 | 3,391.22 | 0.00 | 0.00 | 8,895.85 |
| IESI | | | 4,000.00 | | 0.00 | 0.00 | 4,807.40 | 0.00 | 0.00 | 0.00 | 5,425.95 | 0.00 | 0.00 | 14,233.36 |
| Utilities | 13,000.00 | | | 13,000.00 | | | | 13,000.00 | | | 13,000.00 | | | 52,000.00 |
| Internet | 755.37 | 276.66 | 330.89 | 979.34 | 907.84 | 332.50 | 397.68 | 1,091.14 | 1,013.26 | 371.86 | 448.85 | 1,002.97 | 929.75 | 8,838.12 |
| FedEx | 315.00 | 315.00 | 315.00 | 315.00 | 378.58 | 378.58 | 378.58 | 350.96 | 422.39 | 423.39 | 427.29 | 322.60 | 387.72 | 4,730.26 |
| Chocolate Factory Supplies | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,201.85 | 1,201.85 | 1,201.85 | 1,114.16 | 1,341.41 | 1,344.11 | 1,356.49 | 1,024.13 | 1,230.85 | 15,016.70 |
| Food Permits | | | | 290.00 | 0.00 | 0.00 | 0.00 | 323.11 | 0.00 | 0.00 | 0.00 | 297.00 | 0.00 | 910.10 |
| IT Maintenance | | 50.00 | | 50.00 | 0.00 | 60.09 | 0.00 | 55.71 | 0.00 | 67.21 | 0.00 | 51.21 | 0.00 | 334.21 |
| Shopkeep | | | | 520.00 | 0.00 | 0.00 | 0.00 | 579.36 | 0.00 | 0.00 | 0.00 | 532.55 | 0.00 | 1,631.91 |
| Shogo | | | | 140.00 | 0.00 | 0.00 | 0.00 | 155.98 | 0.00 | 0.00 | 0.00 | 143.38 | 0.00 | 439.36 |
| Microsoft Office | | | | 350.00 | 0.00 | 0.00 | 0.00 | 389.96 | 0.00 | 0.00 | 0.00 | 358.45 | 0.00 | 1,098.40 |
| Mailchimp | | | | 160.00 | 0.00 | 0.00 | 0.00 | 178.27 | 0.00 | 0.00 | 0.00 | 163.86 | 0.00 | 502.13 |
| Adobe | | | | 125.00 | 0.00 | 0.00 | 0.00 | 139.27 | 0.00 | 0.00 | 0.00 | 128.02 | 0.00 | 392.29 |
| Worker's Comp Insurance | 1,000.00 | 800.00 | 1,000.00 | 800.00 | 1,201.85 | 961.48 | 1,201.85 | 891.33 | 1,341.41 | 1,075.29 | 1,356.49 | 819.30 | 1,230.85 | 13,679.85 |
| Office Supplies | 50.00 | 50.00 | 50.00 | 50.00 | 60.09 | 60.09 | 60.09 | 55.71 | 67.07 | 67.21 | 67.82 | 51.21 | 61.54 | 750.83 |
| Bank Charges | | | 139.50 | | 0.00 | 0.00 | 167.66 | 0.00 | 0.00 | 0.00 | 189.23 | 0.00 | 0.00 | 496.39 |
| Credit Card Interest Charges | | 225.00 | | 225.00 | 0.00 | 270.42 | 0.00 | 250.69 | 0.00 | 302.42 | 0.00 | 230.43 | 0.00 | 1,503.96 |
| Cell Phones | | 650.00 | | | 0.00 | 0.00 | 781.20 | 0.00 | 0.00 | 873.67 | 0.00 | 0.00 | 0.00 | 2,304.87 |
| Fines & Penalties | | | | 1,000.00 | 0.00 | 0.00 | 0.00 | 1,000.00 | 0.00 | 0.00 | 0.00 | 1,000.00 | 0.00 | 3,000.00 |
| Car Rental | 50.00 | 50.00 | 50.00 | 50.00 | 60.09 | 60.09 | 60.09 | 55.71 | 67.07 | 67.21 | 67.82 | 51.21 | 61.54 | 750.83 |
| Parking | 20.00 | 20.00 | 350.00 | 20.00 | 24.04 | 24.04 | 420.65 | 22.27 | 26.83 | 26.88 | 474.77 | 20.48 | 24.62 | 1,474.59 |
| Gas and Tolls | 175.00 | 175.00 | 175.00 | 175.00 | 210.32 | 210.32 | 210.32 | 194.98 | 234.75 | 235.22 | 237.39 | 179.22 | 215.40 | 2,627.92 |
| Repairs | 1,250.00 | 1,250.00 | 1,250.00 | 1,250.00 | 1,502.31 | 1,502.31 | 1,502.31 | 1,392.70 | 1,676.76 | 1,680.14 | 1,695.61 | 1,280.16 | 1,538.56 | 18,770.87 |
| Auto Lease | | | 900.00 | | 0.00 | 0.00 | 1,081.67 | 0.00 | 0.00 | 0.00 | 1,220.84 | 0.00 | 0.00 | 3,202.51 |
| Auto Expense - Other | | | 200.00 | | 0.00 | 0.00 | 240.37 | 0.00 | 0.00 | 0.00 | 271.30 | 0.00 | 0.00 | 711.67 |
| **Total G&A and Other Expenses** | **$46,265.37** | **$8,511.66** | **$24,325.39** | **$24,149.34** | **$34,196.98** | **$16,342.99** | **$20,416.05** | **$25,041.32** | **$41,616.09** | **$10,259.61** | **$22,478.98** | **$31,081.16** | **$34,405.83** | **$339,090.78** |
| **Debt Service Payments and Other Costs:** | | | | | | | | | | | | | | |
| SBA Principal Payment | | | | 1,157.18 | | | | 1,157.18 | | | | 1,157.18 | | $3,471.55 |
| SBA Interest Payment | | | | 1,540.25 | | | | 1,536.47 | | | | 1,532.68 | | 4,609.40 |
| **Total Debt Service Payments** | **$0.00** | **$0.00** | **$0.00** | **$2,697.43** | **$0.00** | **$0.00** | **$0.00** | **$2,693.65** | **$0.00** | **$0.00** | **$0.00** | **$2,689.86** | **$0.00** | **$8,080.94** |
| **Total Operations Cash Uses** | **$158,997.14** | **$117,144.46** | **$212,230.83** | **$97,879.57** | **$118,977.87** | **$90,270.57** | **$232,014.65** | **$97,772.50** | **$138,400.71** | **$87,384.22** | **$131,560.39** | **$208,223.84** | **$131,190.44** | **$1,822,047.19** |
| **Total Cash Flow from Operations** | **($74,150.37)** | **($32,100.58)** | **($122,647.00)** | **($10,632.63)** | **($31,795.75)** | **2,203.63** | **($140,222.17)** | **($4,826.84)** | **($47,820.57)** | **3,770.51** | **($40,171.43)** | **($116,785.72)** | **($39,832.28)** | **($655,011.19)** |
| Beginning Cash Balance | $461,992.27 | $387,841.90 | $355,741.32 | $233,094.33 | $222,461.70 | $190,665.95 | $192,869.58 | $52,647.41 | $47,820.57 | $0.00 | $3,770.51 | ($36,400.92) | ($153,186.64) | |
| Cash Use | ($74,150.37) | ($32,100.58) | ($122,647.00) | ($10,632.63) | ($31,795.75) | 2,203.63 | ($140,222.17) | ($4,826.84) | ($47,820.57) | 3,770.51 | ($40,171.43) | ($116,785.72) | ($39,832.28) | |
| **Ending Cash Balance** | **$387,841.90** | **$355,741.32** | **$233,094.33** | **$222,461.70** | **$190,665.95** | **$192,869.58** | **$52,647.41** | **$47,820.57** | **$0.00** | **$3,770.51** | **($36,400.92)** | **($153,186.64)** | **($193,018.92)** | |