**ASSET PURCHASE AGREEMENT**

by and between

FIKA Acquisitions, LLC

and

Pachanga, Inc.; Corossol FIKA Tower LLC; Corossol LLC; Corossol Tribeca LLC;
FIKA 41 W 58th Street LLC; FIKA 66 Pearl Street LLC; FIKA 141 W 41st Street LLC;
FIKA 157 7th Avenue LLC; FIKA 824 10th Ave LLC; FIKA Catering LLC; FIKA
Espresso Bars LLC; FIKA Tribeca LLC; FIKA Web Orders LLC; MILA Solutions LLC;
FIKA 10 Park Avenue LLC; FIKA 1331 Lexington LLC; FIKA 52 Duane Street; FIKA
555 6th Avenue; and FIKA Columbus Circle LLC.

dated as of

October 8, 2018

## TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ................................................................ 2

ARTICLE II PURCHASE AND SALE ................................................ 6

    **Section 2.01**    **Purchase and Sale of Assets** ............................ 6

    **Section 2.02**    **Excluded Assets** ................................................ 7

    **Section 2.03**    **Assumed Liabilities** ......................................... 8

    **Section 2.04**    **Excluded Liabilities** ......................................... 8

    **Section 2.05**    **Purchase Price** ................................................. 9

    **Section 2.06**    **Payment of Purchase Price** ............................. 9

    **Section 2.07**    **Allocation of Purchase Price** .......................... 10

    **Section 2.08**    **Non-assignable Assets** .................................... 10

ARTICLE III CLOSING ................................................................... 10

    **Section 3.01**    **Closing** ............................................................. 10

    **Section 3.02**    **Closing Deliverables** ...................................... 11

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER ................. 11

    **Section 4.01**    **Organization, Standing and Corporate Power** ........ 11

    **Section 4.02**    **Authority of Seller** .......................................... 12

    **Section 4.03**    **No Conflicts; Consents** .................................... 12

    **Section 4.04**    **Title** ................................................................. 13

    **Section 4.05**    **Compliance With Laws** .................................. 13

    **Section 4.06**    **Brokers** ............................................................ 13

    **Section 4.07**    **No Other Representations and Warranties** .............. 13

ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER ................... 13

    **Section 5.01**    **Organization and Authority of Buyer** ........... 13

    **Section 5.02**    **Authority of Buyer** ......................................... 13

    **Section 5.03**    **No Conflicts; Consents** .................................... 14

    **Section 5.04**    **Brokers** ............................................................ 14

    **Section 5.05**    **Sufficiency of Funds** ...................................... 14

i

Section 5.06    **Solvency** ...........................................................................14

Section 5.07    **Legal Proceedings** ...........................................................15

Section 5.08    **Independent Investigation** ..............................................15

Section 5.09    **Adequate Assurance** .........................................................15

Section 5.10    **"AS IS" TRANSACTION** ................................................15

Section 5.11    **Privacy Policy** ..................................................................16

ARTICLE VI COVENANTS .............................................................................16

Section 6.01    **Conduct of Business Prior to the Closing** ....................16

Section 6.02    **Access to Information** ......................................................16

Section 6.03    **Supplement to Disclosure Schedules** .............................17

Section 6.04    **Intentionally Omitted.** .....................................................17

Section 6.05    **Intentionally Omitted.** .....................................................17

Section 6.06    **Governmental Approvals and Consents** .........................17

Section 6.07    **Bankruptcy Court Approval** ..........................................17

Section 6.08    **Books and Records** ..........................................................18

Section 6.09    **Closing Conditions** ..........................................................19

Section 6.10    **Public Announcements** ....................................................19

Section 6.11    **Bulk Sales Laws** ..............................................................19

Section 6.12    **Transfer Taxes** .................................................................19

Section 6.13    **Cure Amounts** ..................................................................19

Section 6.14    **Further Assurances** .........................................................20

ARTICLE VII CONDITIONS TO CLOSING ...................................................20

Section 7.01    **Conditions to Obligations of All Parties** .......................20

Section 7.02    **Conditions to Obligations of Buyer** ..............................20

Section 7.03    **Conditions to Obligations of Seller** ...............................21

ARTICLE VIII TERMINATION ........................................................................22

Section 8.01    **Termination** ......................................................................22

Section 8.02    **Effect of Termination** ......................................................23

Section 8.03    **Frustration of Closing Conditions** ................................23

ARTICLE IX MISCELLANEOUS .....................................................................23

**Section 9.01**    **Sale of Assets Subject to Bankruptcy Court Approval** ...........23

**Section 9.02**    **Survival of Representations and Warranties and Covenants** ....................................................................................23

**Section 9.03**    **Expenses** .................................................................................24

**Section 9.04**    **Notices** .....................................................................................24

**Section 9.05**    **Interpretation** .........................................................................25

**Section 9.06**    **Severability** .............................................................................25

**Section 9.07**    **Entire Agreement; No Third Party Beneficiaries** ...................26

**Section 9.08**    **Successors and Assigns** ...........................................................26

**Section 9.09**    **Amendment and Modification; Waiver** ...................................26

**Section 9.10**    **Governing Law; Submission to Jurisdiction; Waiver of Jury Trial** ...................................................................................26

**Section 9.11**    **Specific Performance** ..............................................................28

**Section 9.12**    **Counterparts** ...........................................................................28

**Section 9.13**    **Non-recourse** ...........................................................................28

iii

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of October 8, 2018, is entered into by and among Pachanga, Inc., Corossol FIKA Tower LLC; Corossol LLC; Corossol Tribeca LLC; FIKA 41 W 58th Street LLC; FIKA 66 Pearl Street LLC; FIKA 141 W 41st Street LLC; FIKA 157 7th Avenue; FIKA 824 10th Ave LLC; FIKA Catering LLC; FIKA Espresso Bars LLC; FIKA Tribeca LLC; FIKA Web Orders LLC; MILA Solutions LLC; FIKA 10 Park Avenue LLC; FIKA 1331 Lexington LLC; FIKA 52 Duane Street; FIKA 555 6th Avenue; and FIKA Columbus Circle LLC, each of which is organized under New York law (singularly and/or collectively, "**Seller**"), and FIKA Acquisitions, LLC, a Delaware limited liability company ("**Buyer**").

## RECITALS

WHEREAS, Seller is engaged, through its numerous retail locations in the production and sale of gourmet coffee and food (the "**Business**");

WHEREAS, on September 14, 2018 (the "**Petition Date**"), Seller filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") thereby commencing chapter 11 cases (collectively, the "**Bankruptcy Case**"). Each Seller is continuing in possession of its assets and in the management of their businesses as debtors in possession under Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, it is intended that the acquisition of the Purchased Assets (as hereinafter defined) would be accomplished through the sale, transfer and assignment of the Purchased Assets by Seller to Buyer in a sale undertaken pursuant to § 363 of the Bankruptcy Code and that certain executory contracts will be assumed by Seller and assigned to Buyer pursuant to § 365 of the Bankruptcy Code, in each instance, free and clear of all Encumbrances (as hereinafter defined) other than Permitted Encumbrances (as hereinafter defined);

WHEREAS, the Seller shall file a motion with the Bankruptcy Court on the Petition Date or as soon thereafter as reasonably practicable seeking, among other things, the Bankruptcy Court's approval of (1) certain procedures in connection with the proposed sale of the Purchased Assets and assumption and assignment of certain executory contracts and/or unexpired leases in connection therewith; and (2) the sale of the Purchased Assets pursuant to section 363 of the Bankruptcy Code and the assumption and assignment of certain executory contracts and/or unexpired leases pursuant to section 365 of the Bankruptcy Code (the "**Sale Motion**");

WHEREAS, the Sale Motion shall also seek the entry of an order, in form and substance reasonably acceptable to the Buyer (the "**Bidding Procedures Order**"), approving the bidding procedures set forth in the Sale Motion; and

WHEREAS, Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, all of the Purchased Assets and Assumed Liabilities (as

hereinafter defined), subject to the entry of the Sale Order (as hereinafter defined) and on the other terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
### DEFINITIONS

The following terms have the meanings specified or referred to in this **Article I**:

"**$**" means the lawful currency of the United States.

"**Affiliate**" of any Person means another Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person.  For purposes of this definition, the terms "**control**," "**controlling**," "**controlled**" and words of similar import, when used in this context, mean, with respect to any Person, the possession, directly or indirectly, of the power to direct, or cause the direction of, management policies of such Person, whether through the ownership of voting securities, by contract or otherwise; *provided, however,* that in no event shall Buyer be deemed to be an Affiliate of Seller for purposes of this Agreement or any of the Transaction Documents.

"**Agreement**" has the meaning set forth in the preamble.

"**Assigned Contracts**" means those Contracts set forth on **Section 2.01** of the Disclosure Schedules.  Buyer may add or remove Contracts from those considered Assigned Contracts hereunder at any time up to the later of (i) the Closing Date; or the Contract Cure Adjudication Date.

"**Assignment and Assumption Agreement**" has the meaning set forth in **Section 3.02(a)(ii)**.

"**Assignment and Assumption of Lease**" has the meaning set forth in **Section 3.02(a)(iii)**.

"**Assumed Liabilities**" has the meaning set forth in **Section 2.03**.

"**Auction**" means the auction to consider bids for the purchase of Sellers assets to be scheduled and conducted in accordance with the Bidding Procedures Order.

"**Bankruptcy Case**" has the meaning set forth in the recitals.

"**Bankruptcy Code**" has the meaning set forth in the recitals.

"**Bankruptcy Court**" has the meaning set forth in the recitals.

"**Bankruptcy Orders**" has the meaning set forth in **Section 6.07(b)**.

"**Bid Procedures**" means bid procedures and bid protections set forth on Exhibit "1" to the Bidding Procedures Order and attached as <u>Exhibit B</u> hereto.

"**Bidding Procedures Order**" has the meaning set forth in the recitals.

"**Bill of Sale**" has the meaning set forth in **Section 3.02(a)(i)**.

"**Books and Records**" has the meaning set forth in **Section 2.01(f)**.

"**Business**" has the meaning set forth in the recitals.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in New York, New York are authorized or required by Law to be closed for business.

"**Buyer**" has the meaning set forth in the preamble.

"**Cash Deposit**" has the meaning set forth in **Section 2.06(a)**.

"**Cash Purchase Price**" has the meaning set forth in **Section 2.05(b)**.

"**Challenge**" has the meaning set forth in **Section 2.05(b)**.

"**Closing**" has the meaning set forth in **Section 3.01**.

"**Closing Date**" has the meaning set forth in **Section 3.01**.

"**Closing Payment**" has the meaning set forth in **Section 2.06(b)**.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated thereunder.

"**Contract**" means any written contract, agreement, order or commitment of any nature whatsoever, including any sales order, purchase order, lease, sublease, license agreement, services agreement, loan agreement, mortgage, security agreement, guarantee, management contract, employment agreement, consulting agreement, partnership agreement, stockholders agreement, buy-sell agreement, option, warrant, debenture, subscription, call or put.

"**Contract Cure Adjudication Date**" has the meaning set forth in **Section 6.13**.

"**Credit Bid**" has the meaning set forth in **Section 2.05(a)**.

"**Cure Amounts**" means all amounts payable in connection with the cure of monetary defaults under any of the Assigned Contracts to the extent required by Section 365(b) of the Bankruptcy Code as either agreed upon by Seller and Buyer or as set forth in any Bankruptcy Order.

"**Data Room**" means the electronic documentation site established by SSG Capital Advisors, LLC on behalf of Seller.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Seller and Buyer concurrently with the execution and delivery of this Agreement.

"**Drop Dead Date**" has the meaning set forth in **Section 8.01(b)(i)**.

"**Employees**" means those individuals set forth in Section 1.01(a) of the Disclosure Schedules, who were employed by Seller immediately prior to the Closing.

"**Encumbrance**" means any lien, security interest, pledge, mortgage, easement, leasehold, assessment, tax, covenant, reservation, conditional sale, prior assignment, or any other encumbrance, "claim" (as defined in Section 101(5) of the Bankruptcy Code), burden or charge of any nature whatsoever.

"**Escrow Agent**" means Rubin LLC.

"**Excluded Assets**" has the meaning set forth in **Section 2.02**.

"**Excluded Liabilities**" has the meaning set forth in **Section 2.04**.

"**Governmental Authority**" means any foreign, federal, state or local government, or any political subdivision thereof, or any court, agency or other body, organization, group, stock market or exchange exercising any executive, legislative, judicial, quasi-judicial, regulatory or administrative function of government.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Law**" means any provision of any law, statute, ordinance, code, constitution, charter, treaty, rule or regulation of any Governmental Authority.

"**Leased Real Property**" means all material real property leased by Seller.

"**Leases**" means all unexpired leases for each Leased Real Property.

"**Material Adverse Effect**" means any event, occurrence, fact, condition or change that is materially adverse to (a) the business, results of operations, financial condition or assets of Seller, or (b) the ability of Seller to consummate the transactions contemplated hereby; *provided, however,* that "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions; (ii) conditions generally affecting the industries in which Seller operates; (iii) any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates; (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (v) any action required or permitted by this Agreement or any action

taken (or omitted to be taken) with the written consent of or at the written request of Buyer; (vi) any matter of which Buyer is aware on the date hereof; (vii) any changes in applicable Laws or accounting rules (including United States generally accepted accounting principles in effect from time to time) or the enforcement, implementation or interpretation thereof; (viii) the announcement, pendency or completion of the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationships with Seller; (ix) any natural or man-made disaster or acts of God; (x) any failure by Seller to meet any internal or published projections, forecasts or revenue or earnings predictions (provided that the underlying causes of such failures (subject to the other provisions of this definition) shall not be excluded); or (xi) the filing of the Bankruptcy Case.

"**Pachanga**" means Pachanga, Inc.

"**Permits**" means all permits, licenses, franchises, approvals, authorizations and consents required to be obtained from Governmental Authorities.

"**Permitted Encumbrances**" means those Encumbrances set forth in Section 1.01(b) of the Disclosure Schedules.

"**Person**" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, Governmental Authority or other entity.

"**Petition Date**" has the meaning set forth in the recitals.

"**Pre-Closing Period**" has the meaning set forth in **Section 6.01**.

"**Purchase Price**" has the meaning set forth in **Section 2.05(a)**.

"**Purchased Assets**" has the meaning set forth in **Section 2.01**.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Sale Motion**" has the meaning set forth in the recitals.

"**Sale Order**" has the meaning set forth in **Section 6.07(a)**.

"**Schedule Supplement**" has the meaning set forth in **Section 6.03**.

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Seller**" has the meaning set forth in the preamble.

"**Subsidiary**" of any Person means another Person, of which the first Person (either alone or through or together with any other of its Subsidiaries) owns, directly or

indirectly, fifty percent (50%) or more of the stock or other equity interests entitled to vote for the election of the board of directors or other governing body of such Person.

"**Taxes**" means all income, profits, capital gains, payroll, unemployment, customs duties, premium, compensation, franchise, gross receipts, capital, net worth, sales, use, withholding, social security, disability, real property, personal property (tangible and intangible), stamp, transfer (including real property transfer or gains), excise, duties, levies, imposts and other similar taxes (including any and all fines, penalties and additions attributable to or otherwise imposed on or with respect to any such taxes and interest thereon) imposed by or on behalf of any Governmental Authority.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document required to be filed with respect to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Transaction Documents**" means this Agreement, the Bill of Sale, the Assignment and Assumption Agreement, Assignment and Assumption of Leases and the other agreements, instruments and documents required to be delivered at the Closing.

## ARTICLE II
### PURCHASE AND SALE

**Section 2.01    Purchase and Sale of Assets.**  Subject to the terms and conditions set forth herein, and subject to the entry of the Sale Order and subject to, and to the extent of, the terms and conditions of the Sale Order, at the Closing, Seller shall (and, if applicable, shall cause its Subsidiaries to) sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of all Encumbrances (other than Permitted Encumbrances), all of Seller's right, title and interest in, to and under all of the following assets, properties and rights of Seller, in each case, to the extent that such assets, properties and rights exist as of the Closing Date (collectively, the "**Purchased Assets**"):

(a)    all of the assets, properties and rights of Seller set forth on **Section 2.01** of the Disclosure Schedules;

(b)    all Assigned Contracts;

(c)    all prepaid expenses, credits, advance payments, security, deposits, charges, sums and fees to the extent related to any Purchased Assets;

(d)    all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;

(e)    all claims, rights and causes of action of Seller arising under Sections 547 and 550 of the Bankruptcy Code against the individuals or entities that Buyer anticipates maintaining as vendors and suppliers, as set forth on **Section 2.01(e)** of the Disclosure Schedules

(f)      originals, or where not available, copies, of all books and records, including books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records, strategic plans, internal financial statements and marketing and promotional surveys, material and research, that exclusively relate to the Purchased Assets, other than books and records set forth in **Section 2.02(e)** of the Disclosure Schedules ("**Books and Records**"); provided that Seller shall be permitted to retain copies of all Books and Records; and

(g)      all goodwill associated with any of the Purchased Assets.

**Section 2.02    Excluded Assets.** Other than the Purchased Assets, Buyer expressly understands and agrees that it is not purchasing or acquiring, and Seller is not selling or assigning, any other assets or properties of Seller or its Subsidiaries, and all such other assets and properties shall be excluded from the Purchased Assets (the "**Excluded Assets**").  Excluded Assets include the following assets and properties of Seller:

(a)      all assets, properties and rights used by Seller in its businesses other than the Purchased Assets;

(b)      all Contracts, other than Assigned Contracts;

(c)      Other than the Purchased Assets described in Section 2.01(d) above, all rights to any action, suit or claim of any nature that Seller or Seller's bankruptcy estate may hold, whether arising by way of counterclaim or otherwise, including, without limitation, all claims, rights and causes of action of Seller arising under or relating to Chapter 5 of the Bankruptcy Code (whether or not asserted as of the Closing Date), including, without limitation, any such claims and actions arising under Sections 544, 545, 547, 548, 549 or 551 of the Bankruptcy Code;

(d)      all cash and cash equivalents, bank accounts and securities of Seller;

(e)      the assets, properties and rights specifically set forth on **Section 2.02(e)** of the Disclosure Schedules; and

(f)      the rights which accrue or will accrue to Seller under the Transaction Documents.

**Section 2.03   Assumed Liabilities.** Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge when due any and all liabilities and obligations of Seller arising out of or relating to the Purchased Assets on or after the Closing, other than the Excluded Liabilities (collectively, the "**Assumed Liabilities**"), including, without limitation, the following:

(a)      all of Seller's secured liabilities and obligations to the Small Business Administration;

(b)      all liabilities and obligations arising under or relating to the Assigned Contracts; including, without limitation, all Cure Amounts;

(c)      all liabilities and obligations of Seller for pre-petition sales taxes owed to the New York State Department of Taxation and Finance to the extent same are (i) entitled to priority treatment under section 507(a) of the Bankruptcy Code and (ii) set forth on the schedules to Seller's petitions for relief under Chapter 11 of Title 11 of the Bankruptcy Code in the Bankruptcy Court;

(d)      all liabilities and obligations for (i) Taxes relating to the Purchased Assets or the Assumed Liabilities for any taxable period ending after the Closing Date and (ii) Taxes for which Buyer is liable pursuant to **Section 6.12**;

(e)      all other liabilities and obligations arising out of or relating to Buyer's ownership of the Purchased Assets on or after the Closing; and

(f)      all liabilities and obligations of Seller set forth on **Section 2.03(f)** of the Disclosure Schedules.

**Section 2.04   Excluded Liabilities.**   Except with respect to the Assumed Liabilities, Buyer shall not assume and shall not be responsible to pay, perform or discharge any of the following liabilities or obligations of Seller (collectively, the "**Excluded Liabilities**"):

(a)      any liabilities or obligations arising out of or relating to Seller's ownership of the Purchased Assets prior to the Closing Date;

(b)      any liabilities or obligations relating to or arising out of the Excluded Assets;

(c)      any liabilities or obligations for (i) Taxes relating to the Purchased Assets or the Assumed Liabilities for any taxable period ending on or prior to the Closing Date and (ii) any other Taxes of Seller (other than Taxes allocated to Buyer under **Section 6.12**) for any taxable period; and

(d)      any liabilities or obligations of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants,

advisers and others.

Section 2.05   Purchase Price.   In consideration for the Purchased Assets, Buyer shall:

(a)      credit bid (the "**Credit Bid**") of all of the Buyer's secured claims against Pachanga and the other Debtors in the amount of $11,115,604.00, such claims being secured by blanket liens (the "**Buyer's liens**") against all of the Debtors' assets, subject only to valid properly perfected liens of the Small Business Administration;

(b)      pay to Seller $325,000.00 (the "**Cash Purchase Price**" together with the Credit Bid, the "**Purchase Price**").  If any party in interest shall challenge or commence any litigation challenging the validity, priority or extent of Buyer's liens (a "**Challenge**"), then the Cash Purchase Price shall be reduced on a dollar for dollar basis by the amount of expenses incurred, including without limitation legal fees and expenses, by the Buyer in connection with such Challenge; and

(c)      assume the Assumed Liabilities.

Section 2.06   Payment of Purchase Price.

(a)      Upon execution of this Agreement, Buyer shall deliver to Escrow Agent a deposit equal to ten percent (10%) of the Cash Purchase Price in immediately available funds (the "**Cash Deposit**").  The Cash Deposit shall be held by the Escrow Agent in a non-interest-bearing account.  The Cash Deposit shall be held by the Escrow Agent and be released as follows:

(i)      If the Closing shall occur, then the Cash Deposit, shall be applied toward payment of the Purchase Price.

(ii)      If this Agreement is terminated by Seller pursuant to **Section 8.01(c)**, the Seller shall retain the Cash Deposit as liquidated damages.  Because it would be impractical and extremely difficult to determine the extent of any damages that might result from a breach of, or default under, this Agreement by Buyer prior to the Closing, it is understood and agreed that such liquidated damages (in an amount equal to the Cash Deposit) represent Buyer's and Seller's reasonable estimate of actual damages, such liquidated damages do not constitute a penalty and such Cash Deposit shall constitute Seller's sole and exclusive remedy for any breach of, or default under, this Agreement by Buyer prior to the Closing.

(iii)      If this Agreement is terminated pursuant to **Article VIII** other than in accordance with **Section 8.01(c)**, the Escrow Agent shall deliver the Cash Deposit, together with all accrued investment income thereon, to Buyer.

(b)      At the Closing, Buyer shall make a cash payment (the "**Closing Payment**") to Seller in the amount equal to the Purchase Price minus an amount equal to the Cash Deposit and any accrued investment income thereon which is actually paid to Buyer in accordance with **Section 2.06(a)(i)**.  Such cash payment shall be made by wire

transfer of immediately available funds to such account(s) as Seller shall designate.  At the Closing, the Escrow Agent shall transfer the Cash Deposit to Seller by wire transfer of immediately available funds to such account(s) as Seller shall designate.

**Section 2.07   Allocation of Purchase Price.**  Seller and Buyer agree that the Purchase Price and the Assumed Liabilities (plus other relevant items) shall be allocated among the Purchased Assets for all purposes (including Tax and financial accounting) in a manner consistent with Section 1060 of the Code.

**Section 2.08   Non-assignable Assets.**  Notwithstanding anything to the contrary in this Agreement, and subject to the provisions of this **Section 2.08**, to the extent that the sale, assignment, transfer, conveyance or delivery, or attempted sale, assignment, transfer, conveyance or delivery, to Buyer of any Purchased Asset would result in a violation of applicable Law, or would require the consent, authorization, approval or waiver of a Person who is not a party to this Agreement or an Affiliate of a party to this Agreement (including any Governmental Authority), and such restriction, consent, authorization, approval or waiver shall not have been obtained prior to the Closing or cannot be effectively overridden or canceled by the Sale Order or other Bankruptcy Order, this Agreement shall not constitute a sale, assignment, transfer, conveyance or delivery, or an attempted sale, assignment, transfer, conveyance or delivery, thereof; *provided, however,* that, subject to the satisfaction or waiver of the conditions contained in **Article VII**, the Closing shall occur notwithstanding the foregoing without any adjustment to the Purchase Price on account thereof.  Following the Closing, Seller to the extent it would not be required to incur any additional cost, liability or expense therefore, and Buyer shall use commercially reasonable efforts, and shall cooperate with each other, to obtain any such required consent, authorization, approval or waiver, or any release, substitution or amendment required to novate all liabilities and obligations under any and all Assigned Contracts or other liabilities that constitute Assumed Liabilities or to obtain in writing the unconditional release of all parties to such arrangements, so that, in any case, Buyer shall be solely responsible for such liabilities and obligations from and after the Closing Date; *provided, however,* that neither Seller nor Buyer shall be required to pay any consideration therefor.  Once such consent, authorization, approval, waiver, release, substitution or amendment is obtained, Seller shall sell, assign, transfer, convey and deliver to Buyer the relevant Purchased Asset to which such consent, authorization, approval, waiver, release, substitution or amendment relates for no additional consideration.  Applicable sales, transfer and other similar Taxes in connection with such sale, assignment, transfer, conveyance or license shall be paid by Buyer in accordance with **Section 6.12**.

### ARTICLE III
#### CLOSING

**Section 3.01   Closing.**  Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Rubin LLC, 345 Seventh Avenue, 21st Floor, New York, New York, 10001, at 9:00 AM, local time, on the second Business Day after all of the conditions to Closing set forth in **Article VII** are either satisfied or waived (other than

conditions which, by their nature, are to be satisfied on the Closing Date), or at such other time, date or place as Seller and Buyer may mutually agree upon in writing.  The date on which the Closing is to occur is herein referred to as the "**Closing Date**."

**Section 3.02    Closing Deliverables.**

(a)    At the Closing, Seller shall deliver to Buyer the following:

(i)    a bill of sale in the form of Exhibit B hereto (the "**Bill of Sale**") and duly executed by Seller, transferring the furniture, fixtures, equipment, supplies and other tangible personal property included in the Purchased Assets to Buyer;

(ii)    an assignment and assumption agreement in the form of Exhibit C hereto (the "**Assignment and Assumption Agreement**") and duly executed by Seller, effecting the assignment to and assumption by Buyer of the Purchased Assets and the Assumed Liabilities;

(iii)    with respect to each Lease, an Assignment and Assumption of Lease substantially in the form of Exhibit D (each, an "**Assignment and Assumption of Lease**"), duly executed by Seller;

(iv)    a copy of the Sale Order;

(v)    the certificates of the Secretary or Assistant Secretary of Seller required by **Section 7.02(d)** and **Section 7.02(d)**; and

(vi)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

(b)    At the Closing, Buyer shall deliver to Seller the following:

(i)    the Closing Payment in accordance with **Section 2.06(b)**;

(ii)    the Assignment and Assumption Agreement duly executed by Buyer;

(iii)    with respect to each Lease, an Assignment and Assumption of Lease duly executed by Buyer;

(iv)    the certificates of the Secretary or Assistant Secretary of Buyer required by **Section 7.03(d)** and **Section 7.03(e)**.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

Seller hereby represents and warrants to Buyer as follows:

**Section 4.01    Organization, Standing and Corporate Power.**    Except as a

result of commencement of the Bankruptcy Case, Seller is a corporation duly organized, validly existing and in good standing under the Laws of the State of New York and has all necessary corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as currently conducted.  Except as a result of commencement of the Bankruptcy Case, Seller is duly licensed or qualified to do business and is in good standing in the State of New York.

**Section 4.02   Authority of Seller.**   Subject to the Bankruptcy Court's entry of the Sale Order, Seller has all necessary corporate power and authority to enter into this Agreement and the other Transaction Documents to which Seller is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.   The execution and delivery by Seller of this Agreement and any other Transaction Document to which Seller is a party, the performance by Seller of its obligations hereunder and thereunder and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Seller.  This Agreement has been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement, subject to the Bankruptcy Court's entry of the Bankruptcy Orders, constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).  When each other Transaction Document to which Seller is or will be a party has been duly executed and delivered by Seller (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document, subject to the Bankruptcy Court's entry of the Bankruptcy Orders, will constitute a legal and binding obligation of Seller enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 4.03   No Conflicts; Consents.**   To the best of Seller's knowledge, subject to the entry of the Sale Order, the execution, delivery and performance by Seller of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) result in a violation or breach of any provision of the Certificate of Incorporation, as amended, or Bylaws of Seller; or (b) result in a violation or breach of any provision of any Law or Governmental Order applicable to Seller the Purchased Assets.  Except for the Bankruptcy Court's entry of the Sale Order, no consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Seller in connection with the execution and delivery of this Agreement or any of the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, except for such filings as may be required to be filed with the Bankruptcy Court or pursuant to the Bankruptcy Code, or as set forth in **Section 4.03** of the Disclosure Schedules and such consents, approvals, Permits, Governmental Orders, declarations, filings or notices which, in the aggregate, would not

have a Material Adverse Effect.

**Section 4.04  Title.**  Except as set forth in **Section 4.04** of the Disclosure Schedules, Seller has good and valid title to, or a valid leasehold interest in, the Purchased Assets.

**Section 4.05  Compliance With Laws.** To the best of Seller's knowledge, Seller is in compliance with all Laws applicable to the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets, except where the failure to be in compliance would not have a Material Adverse Effect.

**Section 4.06  Brokers.**  Except for SSG Capital Advisors, LLC, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's or financial advisor's fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

**Section 4.07  No Other Representations and Warranties.** Except for the representations and warranties contained in this **Article IV** (including the related portions of the Disclosure Schedules), neither Seller nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to the accuracy or completeness of any information regarding the Purchased Assets furnished or made available to Buyer and its Representatives (including any information, documents or material delivered  or made available to Buyer in the Data Room, management presentations or in any other form in expectation of the transactions contemplated hereby).

## ARTICLE V
### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

**Section 5.01  Organization and Authority of Buyer.** Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of New York.

**Section 5.02  Authority of Buyer.**  Buyer has all necessary power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of Buyer.  This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether

enforcement is sought in a proceeding at law or in equity).  When each other Transaction Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 5.03   No Conflicts; Consents.**  The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) result in a violation or breach of any provision of the certificate of formation or operating agreement of Buyer; (b) result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default under or result in the acceleration of any agreement to which Buyer is a party, except in the cases of clauses (b) and (c), where the violation, breach, conflict, default, acceleration or failure to give notice would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.  No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and such consents, approvals, Permits, Governmental Orders, declarations, filings or notices which would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby and thereby.

**Section 5.04   Brokers.**  No broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's or financial advisor's fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

**Section 5.05   Sufficiency of Funds.**  Buyer has sufficient cash on hand to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

**Section 5.06   Solvency.**  Immediately after giving effect to the transactions contemplated hereby, Buyer shall be solvent and shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities); and (c) have adequate capital to carry on its business.  No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of Buyer or Seller.  In connection with the transactions contemplated hereby, Buyer has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

**Section 5.07  Legal Proceedings.**    There are no actions, suits, claims, investigations or other legal proceedings pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

**Section 5.08  Independent Investigation.**  Buyer has conducted its own independent investigation, review and analysis of Seller's business, the Purchased Assets, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Seller set forth in **Article IV** of this Agreement (including related portions of the Disclosure Schedules); and (b) neither Seller nor any other Person has made any representation or warranty as to Seller, Seller's business, the Purchased Assets or this Agreement, except as expressly set forth in **Article IV** of this Agreement (including the related portions of the Disclosure Schedules).

**Section 5.09  Adequate Assurance.**  Buyer has the ability to demonstrate to the Bankruptcy Court adequate assurance of future performance under the Assigned Contracts, and shall provide a copy of its financial statements and such other financial information reasonably available to Buyer that is required by the Bankruptcy Court to demonstrate Buyer's ability to assume, or to take an assignment of, the Assigned Contracts.

**Section 5.10  "AS    IS"    TRANSACTION.**    BUYER    HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, SELLER MAKES NO (AND SELLER EXPRESSLY DISCLAIMS AND NEGATES ANY) REPRESENTATIONS OR WARRANTIES OF ANY KIND, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, WITH RESPECT TO THE PURCHASED ASSETS OR ANY OTHER MATTER WHATSOEVER, INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS, THE PHYSICAL CONDITION OF ANY PART OF THE PURCHASED ASSETS OR ANY OTHER ASSET WHICH IS THE SUBJECT OF ANY LEASE OR CONTRACT TO BE ASSUMED BY BUYER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY REAL PROPERTY OWNED BY SELLERS OR WHICH ARE THE SUBJECT OF ANY LEASE TO BE ASSUMED BY BUYER AT THE CLOSING, THE ZONING OF ANY SUCH REAL ESTATE, THE VALUE OF THE    PURCHASED    ASSETS    (OR    ANY    PORTION    THEREOF),    THE TRANSFERABILITY OF THE PURCHASED ASSETS, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE TITLE OF    THE    PURCHASED    ASSETS    (OR    ANY    PORTION    THEREOF),    THE MERCHANTABILITY OR FITNESS OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE PURCHASED ASSETS OR ANY PORTION THEREOF.  WITHOUT IN ANY

WAY LIMITING THE FOREGOING, EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS.   BUYER FURTHER  ACKNOWLEDGES  THAT  BUYER  HAS  CONDUCTED  AN INDEPENDENT  INSPECTION  AND  INVESTIGATION  OF  THE  PHYSICAL CONDITION OF THE PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS BUYER DEEMED NECESSARY  OR  APPROPRIATE  AND  THAT  IN  PROCEEDING  WITH  ITS ACQUISITION  OF  THE  PURCHASED  ASSETS,  EXCEPT  FOR  ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH HEREIN, BUYER  IS  DOING  SO  BASED  SOLELY  UPON  SUCH  INDEPENDENT INSPECTIONS AND INVESTIGATIONS.   ACCORDINGLY, SUBJECT TO THE TERMS AND CONDITIONS OF THIS AGREEMENT, BUYER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

**Section 5.11   Privacy Policy.** Immediately upon the Closing, Buyer shall adopt and abide by the Seller's privacy policy set forth in **Section 5.11** of the Disclosure Schedules.

## ARTICLE VI
### Covenants

**Section 6.01   Conduct of Business Prior to the Closing.**   From the date hereof until the Closing or the earlier termination of this Agreement (the "**Pre-Closing Period**"), except as otherwise provided in this Agreement, consented to in writing by Buyer (which consent shall not be unreasonably withheld or delayed) or as may be limited or modified as a result of the filing of the Bankruptcy Case, Seller shall (i) conduct the Business in the ordinary course of business; and (ii) use commercially reasonable efforts to maintain and preserve intact the current operations of the Business and to preserve the rights, goodwill and relationships of customers, suppliers, and regulators of the Business.

**Section 6.02   Access to Information.**   During the Pre-Closing Period, Seller shall (i) afford Buyer and its Representatives reasonable access to and the right to inspect all of the Leased Real Property, properties, assets, premises, Books and Records, Assigned Contracts and other documents and data related to the Business; (ii) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Business as Buyer or any of its Representatives may reasonably request; and (iii) instruct the Representatives of Seller to cooperate with Buyer in its investigation of the Business; *provided, however,* that any such investigation shall be conducted during normal business hours upon reasonable advance notice to Seller, under the supervision of Seller's personnel and in such a manner as not to interfere with the conduct of the Business or any other businesses of Seller.   All requests by Buyer for access pursuant to this **Section 6.02** shall be submitted or directed exclusively to such individuals as Seller may designate in writing from time to time.   Notwithstanding

anything to the contrary in this Agreement, Seller shall not be required to disclose any information to Buyer if such disclosure would, in Seller's sole discretion: (x) cause significant competitive harm to Seller and its businesses, including the Business, if the transactions contemplated by this Agreement are not consummated; (y) jeopardize any attorney-client or other privilege; or (z) contravene any applicable Law, fiduciary duty or binding agreement entered into prior to the date of this Agreement.  Prior to the Closing, without the prior written consent of Seller, which may be withheld for any reason, Buyer shall not contact any suppliers to, or customers of, the Business and Buyer shall have no right to perform invasive or subsurface investigations of the Leased Real Property.  Buyer shall, and shall cause its Representatives to, abide by the terms of the Confidentiality Agreement with respect to any access or information provided pursuant to this **Section 6.02**.

Section 6.03   **Supplement to Disclosure Schedules.**  From time to time prior to the Closing, Seller shall have the right (but not the obligation) to supplement or amend the Disclosure Schedules hereto with respect to any matter hereafter arising or of which it becomes aware after the date hereof (each a "**Schedule Supplement**").  Any disclosure in any such Schedule Supplement shall not be deemed to have cured any inaccuracy in or breach of any representation or warranty contained in this Agreement, including for purposes of the indemnification or termination rights contained in this Agreement or of determining whether or not the conditions set forth in **Section 7.02(a)** have been satisfied.

Section 6.04   **Intentionally Omitted. Intentionally Omitted.**

Section 6.06   **Governmental Approvals and Consents**.

(a)    Each party hereto shall, as promptly as possible, use its reasonable best efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement and the other Transaction Documents.  Each party shall cooperate fully with the other party and its Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals.  The parties hereto shall not willfully take any action that will have the effect of delaying, impairing or impeding the receipt of any required consents, authorizations, orders and approvals.

(b)    Seller and Buyer shall use commercially reasonable efforts to give all notices to, and obtain all consents from, all third parties that are described in **Section 4.03** of the Disclosure Schedules; *provided, however*, that Seller shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested.

Section 6.07   **Bankruptcy Court Approval.**

(a)    Within five (5) Business Days of the Auction or soon as the matter can be heard by the Bankruptcy Court, Seller shall seek an order of the Bankruptcy Court, in form and substance reasonably acceptable to Seller and Buyer (the "**Sale Order**") that (a)

approves the sale of the Purchased Assets to Buyer on the terms and conditions set forth in this Agreement and authorizes Seller to proceed with the sale of the Purchased Assets to Buyer on the terms and conditions set forth in this Agreement, (b) includes a specific finding that Buyer is a good faith Buyer of the Purchased Assets within the meaning of §363(m) of the Bankruptcy Code and is entitled to the protections of §363(m) of the Bankruptcy Code, (c) states that the sale of the Purchased Assets to Buyer shall be free and clear of all Encumbrances (other than Permitted Encumbrances), and (d) approves Seller's assumption and assignment to Buyer of the Assigned Contracts pursuant to §365 of the Bankruptcy Code subject to such Buyer's ability to demonstrate to the Bankruptcy Court adequate assurance of future performance under the Assigned Contracts. Buyer shall provide a copy of such financial information as may be required by the Bankruptcy Court to demonstrate Buyer's ability to assume, or to take an assignment of, the Assigned Contracts. Both Buyer's and Seller's obligations to consummate the transactions contemplated in this Agreement are conditioned upon the Bankruptcy Court's entry of the Sale Order.

(b)    If the Sale Order or any other order of the Bankruptcy Court relating to this Agreement (collectively, the "**Bankruptcy Orders**") shall be appealed (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), Seller shall use commercially reasonable efforts to defend against such appeal, petition or motion, and Buyer agrees to cooperate in such efforts, and each of Seller and Buyer hereto shall endeavor to obtain an expedited resolution of such appeal.

### Section 6.08    Books and Records.

(a)    In order to facilitate the resolution of any claims made against or incurred by Seller prior to the Closing or in connection with the Bankruptcy Case, or for any other reasonable purpose, for a period of three (3) years after the Closing, Buyer shall:

(i)    retain the Books and Records (including personnel files) relating to periods prior to the Closing in a manner reasonably consistent with the prior practices of Seller; and

(ii)    afford the Seller's Representatives reasonable access (including the right to make, at Seller's expense, photocopies) to such Books and Records during normal business hours upon reasonable advance notice to Buyer, under the supervision of Buyer's personnel and in such a manner as not to interfere with the conduct of the business of Buyer.

(b)    In order to facilitate the resolution of any claims made by or against or incurred by Buyer after the Closing or in connection with the Bankruptcy Case, or for any other reasonable purpose, for a period through the earlier of three (3) years after the Closing and the date the Bankruptcy Case is closed, Seller shall during its existence:

(i)    retain the books and records (including personnel files) of Seller which relate to the Purchased Assets for periods prior to the Closing; and

(ii)    afford the Buyer's Representatives reasonable access (including

the right to make, at Buyer's expense, photocopies) to such books and records during normal business hours upon reasonable advance notice to Seller, under the supervision of Seller's personnel and in such a manner as not to interfere with the conduct of the business of Seller.

(c)     Neither Buyer nor Seller shall be obligated to provide the other party with access to any books or records (including personnel files) pursuant to this **Section 6.08** where such access would violate any Law.

**Section 6.09   Closing Conditions.**  From the date hereof until the Closing, each party hereto shall use commercially reasonable efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in **Article VII** hereof.

**Section 6.10   Public Announcements.**  Each of Buyer and Seller agrees that no public release or announcement (other than court filings in connection with the Bankruptcy Case or in connection with Seller's efforts to obtain entry of the Sale Order) concerning the transactions contemplated hereby shall be issued by any party without the prior written consent of the other party (which consent shall not be unreasonably withheld, conditioned or delayed), except as such release or announcement may be required by applicable Law, court process or the rules and regulations of any national securities exchange or national securities quotation system, in which case the party required to make the release or announcement shall use its reasonable efforts to allow the other party reasonable time to comment on such release or announcement in advance of such issuance, it being understood that the final form and content of any such release or announcement, to the extent required, shall be at the final discretion of the disclosing party.

**Section 6.11   Bulk Sales Laws.**  The parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

**Section 6.12   Transfer Taxes.**  All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other Transaction Documents (including any real property transfer Tax and any other similar Tax) shall be borne and paid by Buyer when due.  Buyer shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Seller shall cooperate with respect thereto as necessary).

**Section 6.13   Cure Amounts.**  At Closing, Buyer shall pay all undisputed Cure Amounts with respect to the Assigned Contracts in accordance with the Sale Order.  If there exists a dispute as to a Cure Amount for an Assigned Contract, then Buyer shall have three business days, after a court order finally and conclusively determining the allowed Cure Amount becomes final and non-appealable (the "**Contract Cure Adjudication Date**"), in which to designate in writing to Seller whether such contract will assumed and assigned to Buyer, in which case the Cure Amount must be paid by

Buyer within three business days of delivery of such written designation.

**Section 6.14   Further Assurances.**   Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

## ARTICLE VII
### CONDITIONS TO CLOSING

**Section 7.01   Conditions to Obligations of All Parties.**   The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)      No Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

**Section 7.02   Conditions to Obligations of Buyer.**   The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)      The representations and warranties of Seller contained in **Article IV** shall be true and correct in all respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date), except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect;

(b)      Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date;

(c)      Seller shall have delivered to Buyer duly executed counterparts to the Transaction Documents (other than this Agreement) to which it is a party and such other documents and deliveries set forth in **Section 3.02(a)**;

(d)      Buyer shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of each Seller, substantially in the form annexed hereto as Exhibit A, certifying: (i) that attached thereto are true and complete copies of all resolutions adopted by the board of directors of Seller authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the

consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby; and (ii) the names and signatures of the officers of Seller authorized to sign this Agreement, the Transaction Documents and the other documents to be delivered hereunder and thereunder;

(e)    Seller shall have received all consents, authorizations, orders and approvals set forth in **Section 7.02(e)** of the Disclosure Schedules, in each case, in form and substance reasonably satisfactory to Buyer; *provided, however,* that Seller shall not be required to obtain any consent, authorization, order, approval or agreement to the consummation of the transactions contemplated by this Agreement or the other Transaction Documents to the extent the Sale Order provides that such consent, authorization, order, approval or agreement is not required;

(f)    The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall not have been reversed, modified, amended or stayed, except for such immaterial modifications or amendments which do not, individually or in the aggregate, materially adversely affect Buyer; and

(g)    In the event a Challenge is commenced, such Challenge must reach a final adjudication or such other final binding resolution is obtained.

**Section 7.03    Conditions to Obligations of Seller.**  The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)    The representations and warranties of Buyer contained in **Article V** shall be true and correct in all respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date), except where the failure of such representations and warranties to be true and correct would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby;

(b)    Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date;

(c)    Buyer shall have delivered (or caused to have been delivered) to Seller the Purchase Price, duly executed counterparts to the Transaction Documents (other than this Agreement) to which it is a party and such other documents and deliveries set forth in **Section 3.02(b)**;

(d)    Seller shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Buyer certifying that attached thereto are true and complete copies of all resolutions adopted by the board of managers of Buyer authorizing

the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby;

(e)    Seller shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Buyer certifying the names and signatures of the officers of Buyer authorized to sign this Agreement, the Transaction Documents and the other documents to be delivered hereunder and thereunder; and

(f)    The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall not have been reversed, modified, amended or stayed, except for such immaterial modifications or amendments which do not, individually or in the aggregate, materially adversely affect Seller.

## ARTICLE VIII
### TERMINATION

**Section 8.01    Termination.**   This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Seller and Buyer;

(b)    by Buyer by written notice to Seller if:

(i)    Buyer is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **Article VII** and such breach, inaccuracy or failure cannot be cured by Seller by December 31, 2018 (the "**Drop Dead Date**"), unless such material breach, inaccuracy in or failure to perform shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(ii)    any of the conditions set forth in **Section 7.01** or **Section 7.02** shall not have been fulfilled by the Drop Dead Date, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(c)    by Seller by written notice to Buyer if:

(i)    Seller is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in **Article VII** and such breach, inaccuracy or failure cannot be cured by Buyer by the Drop Dead Date, unless such material breach, inaccuracy in or failure to perform shall be due to the

failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(ii)    any of the conditions set forth in **Section 7.01** or **Section 7.03** shall not have been fulfilled by the Drop Dead Date or if the Closing shall not have occurred on or before the Drop Dead Date, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(d)    by Buyer or Seller in the event that:

(i)    there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited; or

(ii)    any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable.

**Section 8.02    Effect of Termination.**    In the event of the termination of this Agreement in accordance with this **Article VIII**, this Agreement (other than **Section 2.06(a)**, Error! Reference source not found., this **Section 8.02**, and **Article IX**, each of which shall remain in full force and effect) shall forthwith become void and there shall be no liability on the part of any party hereto except:

(a)    as set forth in this **Article VIII**, **Section 2.06(a), Section 6.04** or **Article IX**; and

(b)    that nothing herein shall relieve any party hereto from liability for any intentional breach of any provision hereof.

**Section 8.03    Frustration of Closing Conditions.**    Neither Seller nor Buyer may rely on the failure of any condition set forth in **Article VII**, or any right of termination under **Section 8.01**, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

## ARTICLE IX
### Miscellaneous

**Section 9.01    Sale of Assets Subject to Bankruptcy Court Approval.**    This Agreement, the sale of the Purchased Assets hereunder, and Seller's obligations and ability to perform under this Agreement is conditioned and contingent upon Bankruptcy Court entry of the Sale Order.

**Section 9.02    Survival of Representations and Warranties and Covenants.** Until the Closing, all representations and warranties herein or in any other Transaction Document shall be operative and in full force and effect.    All representations and warranties and covenants contained herein or in any other Transaction Document shall terminate and shall not survive the Closing, except that covenants that by their terms are

to be performed after Closing shall survive Closing in accordance with their terms.

**Section 9.03    Expenses.**    Except as otherwise expressly provided herein (including **Section 6.12** hereof), all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred; *provided, however,* that Seller shall pay any of all of its costs and expenses approved by the Bankruptcy Court, including, without limitation, all broker's, finder's and financial advisor's fees and commissions payable to SSG Capital Advisors, LLC in connection with the transactions contemplated by this Agreement.

**Section 9.04    Notices.**    All notices, requests, claims, demands, approvals, and other communications hereunder shall be in writing and shall be deemed to have been duly given or made as follows: (i) if personally delivered to an authorized representative of the recipient, when actually delivered to such authorized representative; (ii) if sent via facsimile transmission on a Business Day before 5:00 p.m. in the time zone of the receiving party, when transmitted and receipt is confirmed; (iii) if sent via facsimile transmission on a day other than a Business Day or on a Business Day after 5:00 p.m. in the time zone of the receiving party and receipt is confirmed, on the following Business Day; (iv) if sent by email, when received by the party to be notified; *provided, however,* that notice given by email shall not be effective unless either (A) a duplicate copy of such email notice is promptly given by one of the other methods described in this **Section 9.04**, or (B) receipt of such email notice is confirmed by the receiving party; (v) if sent designated for overnight delivery by a nationally recognized overnight air courier (such as DHL or Federal Express), upon receipt of proof of delivery; and (vi) if sent by registered or certified mail in the United States, return receipt requested, upon receipt; provided, in each case, that such notices, requests, demands and other communications are delivered to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

if to Buyer, to:

FIKA Acquisitions, LLC
134 Spring Street, Suite 304
New York, New York 10012
Attention: Justin Feig
Fax: (631)-439-2262
Email: Justin@qkd.com

with a copy to (which shall not constitute notice to Buyer):

Cozen O'Connor
277 Park Avenue, 20th Floor
New York, New York 10017
Attention: Frederick E. Schmidt, Esq.
Fax: (646)-588-1552

Email: Eschmidt@cozen.com

if to Seller, to:

Pachanga, Inc.
824 10th Avenue
New York, NY 10019
Attention: Lars Akerlund
Email: Lars@fikanyc.com

with a copies to (which shall not constitute notice to Seller):

Rubin LLC
345 Seventh Avenue, 21st Floor
New York, New York 10001
Attention: Paul A. Rubin, Esq.
Fax: (212)-390-8064
Email: prubin@rubinlawllc.com

**Section 9.05    Interpretation.**  When a reference is made in this Agreement to an Article, a Section or an Exhibit, such reference shall be to an Article, a Section of or an Exhibit to this Agreement unless otherwise indicated.  The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The word "or" when used in this Agreement is not exclusive.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term.  Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein.  References to a Person are also to its permitted successors and assigns.  The parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intention or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

**Section 9.06    Severability.**  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect.  Upon such determination that any term or other provision is invalid, illegal or

incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible to the fullest extent permitted by applicable Law in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

**Section 9.07  Entire Agreement; No Third Party Beneficiaries.**    This Agreement (including the Exhibits and Disclosure Schedules hereto), the Transaction Documents, the Confidentiality Agreement, and any agreements entered into contemporaneously herewith pursuant to the transactions contemplated hereby (a) constitute the entire agreement, and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter of this Agreement, the Transaction Documents, and the Confidentiality Agreement, and (b) are not intended to and do not confer upon any Person other than the parties any legal or equitable rights or remedies.

**Section 9.08  Successors and Assigns.**    Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned, in whole or in part, by operation of law or otherwise by any of the parties without the prior written consent of the other parties, and any assignment without such consent shall be null and void.  No assignment shall release Buyer of its obligations hereunder.  Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties and their respective successors and assigns.

**Section 9.09  Amendment and Modification; Waiver.**  The parties hereby irrevocably agree that no attempted amendment, modification, or change of this Agreement shall be valid and effective, unless the parties shall unanimously agree in writing to such amendment, modification or change.  No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  No waiver of any provision of this Agreement shall be effective, unless it is in writing and signed by the party against whom it is asserted, and any such written waiver shall only be applicable to the specific instance to which it relates and shall not be deemed to be a continuing or future waiver.

**Section 9.10  Governing Law; Submission to Jurisdiction; Waiver of Jury Trial**.

(a)    **THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, EXCEPT TO THE EXTENT THAT SUCH LAWS ARE SUPERSEDED BY THE BANKRUPTCY CODE, REGARDLESS OF THE LAWS THAT MIGHT OTHERWISE GOVERN UNDER APPLICABLE PRINCIPLES OF CONFLICTS OF LAWS (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK.**

(b)    **EACH OF THE PARTIES HERETO HEREBY (I) IRREVOCABLY**

AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER TRANSACTION AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RELATING THERETO, (II) AGREES THAT IT WILL NOT ATTEMPT TO DENY OR DEFEAT SUCH PERSONAL JURISDICTION BY MOTION OR OTHER REQUEST FOR LEAVE FROM THE BANKRUPTCY COURT, (III) AGREES THAT IT WILL NOT BRING ANY SUCH ACTION OR PROCEEDING IN ANY COURT OTHER THAN THE BANKRUPTCY COURT, (IV) AGREES THAT ANY CLAIM IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN THE BANKRUPTCY COURT, (V) WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH ACTION OR PROCEEDING IN THE BANKRUPTCY COURT, AND (VI) WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN THE BANKRUPTCY COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  EACH PARTY TO THIS AGREEMENT IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 9.04 (NOTICES). NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

(c)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT AND ANY OF THE TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE EITHER OF SUCH WAIVERS, (II) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVERS, (III) IT MAKES SUCH WAIVERS VOLUNTARILY, AND (IV) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS Section 9.10(c).

**Section 9.11    Specific Performance.** The parties agree that irreparable damage would occur and that the parties would not have any adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that until such time as this Agreement is validly terminated pursuant to the provisions of Article VIII (Termination), the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in the Bankruptcy Court, this being in addition to any other remedy to which they are entitled at law or in equity.  The pursuit of specific enforcement by either party will not be deemed an election of remedies or waiver of the right to pursue any other right or remedy to which such party may be entitled.

**Section 9.12    Counterparts.** This Agreement may be executed in one or more counterparts (including by facsimile or portable document format (.PDF)), all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

**Section 9.13    Non-recourse.** This Agreement may only be enforced against, and any claim, action, suit or other legal proceeding based upon, arising out of, or related to this Agreement, or the negotiation, execution or performance of this Agreement, may only be brought against the entities that are expressly named as parties hereto and then only with respect to the specific obligations set forth herein with respect to such party. No past, present or future director, officer, employee, incorporator, manager, member, partner, stockholder, Affiliate, agent, attorney or other Representative of any party hereto or of any Affiliate of any party hereto, or any of their successors or permitted assigns, shall have any liability for any obligations or liabilities of any party hereto under this Agreement or for any claim, action, suit or other legal proceeding based on, in respect of or by reason of the transactions contemplated hereby.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

FIKA ACQUISITIONS, LLC

By: _____
Name: Justin Feig
Title: Manager


PACHANGA, INC

By: _____
Name: Lars Akerlund
Title: President

COROSSOL FIKA TOWER LLC

By: _____
Name: Lars Akerlund
Title: President

COROSSOL LLC

By: _____
Name: Lars Akerlund
Title: President

COROSSOL TRIBECA LLC

By: _____
Name: Lars Akerlund
Title: President

FIKA 41 W 58TH STREET LLC

By: _____
Name: Lars Akerlund
Title: President

FIKA 66 PEARL STREET LLC

By: _____
Name: Lars Akerlund
Title: President

FIKA 141 W 41st STREET LLC

By: _____

Name:  Lars Akerlund

Title:  President

FIKA 157 7TH AVENUE LLC

By: _____

Name:  Lars Akerlund

Title:  President

FIKA 824 10TH AVE LLC

By: _____

Name:  Lars Akerlund

Title:  President

FIKA CATERING LLC

By: _____

Name:  Lars Akerlund

Title:  President

FIKA ESPRESSO BARS LLC

By: _____

Name:  Lars Akerlund

Title:  President

FIKA TRIBECA LLC

By: _____

Name:  Lars Akerlund

Title:  President

FIKA WEB ORDERS LLC

By: _____

Name:  Lars Akerlund

Title:  President

MILA SOLUTIONS LLC

By: _____

Name:  Lars Akerlund

Title:  President

FIKA 10 PARK AVENUE LLC

By: _____

Name: Lars Akerlund

Title: President


FIKA 1331 LEXINGTON LLC

By: _____

Name: Lars Akerlund

Title: President


FIKA 52 DUANE STREET

By: _____

Name: Lars Akerlund

Title: President


FIKA 555 6TH AVENUE

By: _____

Name: Lars Akerlund

Title: President


FIKA COLUMBUS CIRCLE LLC

By: _____

Name: Lars Akerlund

Title: President

**EXHIBIT A**

Form of Officer's Certificate

**OFFICER'S CERTIFICATE OF [NAME OF SELLER PARTY]**

**[_____ __], 20__]**

Reference is made to the Asset Purchase Agreement, dated as of October [__], 2018, by and among Pachanga, Inc., Corossol FIKA Tower LLC; Corossol LLC; Corossol Tribeca LLC; FIKA 41 W 58th Street LLC; FIKA 66 Pearl Street LLC; FIKA 141 W 41st Street LLC; FIKA 157 7th Avenue; FIKA 824 10th Ave LLC; FIKA Catering LLC; FIKA Espresso Bars LLC; FIKA Tribeca LLC; FIKA Web Orders LLC; and MILA Solutions LLC, each of which is organized under New York law and FIKA Acquisitions, LLC ("Buyer"), a Delaware limited liability company (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Agreement"). Capitalized terms used herein and not defined herein, shall have the meanings assigned to such terms in the Agreement.  This Certificate is being delivered pursuant to Section 7.02(d) of the Agreement.

The undersigned, **[the Secretary] [an Assistant Secretary]** of **[Name of Seller Party]**, a **[_____] [corporation] [limited liability company]** (the "Company"), hereby certifies as follows:

1.    Annexed hereto as Annex A is a true, complete and correct copy of all resolutions of the **[Board of Directors] [Board of Managers] [Managing Member]** of the Company, adopted **[at a meeting duly called at which a quorum was present and voting throughout] [by unanimous written consent]**, authorizing the execution, delivery and performance of the Transaction Documents (as defined in the Agreement) to which the Company is a party and the transactions contemplated thereby, all of which resolutions are in full force and effect on the date hereof.  There are no other resolutions adopted by the Company related to the Transaction or the transactions contemplated thereby.

2.    Annexed hereto as Annex B is a true and correct list of the persons that are duly elected or appointed, as the case may be, and qualified officers of the Company holding the offices indicated opposite their respective names, authorized to execute the Transaction Documents on behalf of the Company and the signatures and offices appearing opposite their respective names are the genuine signatures and offices of such persons.

[Signature page follows]

IN WITNESS WHEREOF, the undersigned as executed this certificate as of the date first above-written.

_____

Name:
Title:

**EXHIBIT B**

<u>Bid Procedures</u>

(See attached)